UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JESS DAVID WOODS, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | No. 1:22-cv-02104-TWP-TAB |
| ) | |
| RON NEAL, ) | |
| ) | |
| Respondent. ) | |

**ORDER DENYING AMENDED WRIT OF HABEAS CORPUS
AND CERTIFICATE OF APPEALABILITY**

This matter is before the Court on Petitioner Jess David Woods Amended Petition for Writ of Habeas Corpus (Dkt. 1) . In 2009, Woods was convicted of murder and conspiracy to commit murder in an Indiana court and sentenced to 100 years imprisonment. He now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, arguing that his trial counsel was ineffective in several respects. For the reasons explained below, Woods's petition is **denied** and a certificate of appealability will not issue.

## I. BACKGROUND

Federal habeas review requires the Court to "presume that the state court's factual determinations are correct unless the petitioner rebuts the presumption by clear and convincing evidence." *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018); *see* 28 U.S.C. § 2254(e)(1). The Indiana Court of Appeals summarized the relevant facts and procedural history as follows:

> Teresa ("Teresa") and Anthony French ("French") were married in 1979 when Teresa was fifteen and pregnant. During their marriage, they had numerous marital difficulties and separated several times. In 1992, Teresa filed for dissolution, but she and French reconciled. In 1993, they lived on Cromer Street in Muncie, Indiana with their three children, ages thirteen, five, and two. At that time, they also owned a rental property on Milton Street in Muncie, a van, a truck, and a boat.
>
> On January 9, 1993, French went to the home of Teresa's sister, Jennifer Nye ("Nye"), pushed his way inside looking for Teresa, demanded to know where she was, and told

Nye, "next time you see her she'll be in the hospital." The next time Nye saw Teresa was the following day, and Teresa was in the hospital. Teresa's face and nose were swollen, she had a black eye, and she was very upset. She made a police report, and French eventually pleaded guilty to battery. After this incident, Teresa lived with Nye for a few months. While Teresa lived at Nye's home, French called there and told Nye "that he either was going to talk to Teresa or he'd kill everybody in the house." Before Nye hung up, French said, "we're going to kill the f[**]kin' bitch." Teresa reinstated the dissolution proceedings, the court ordered French to move out of the Cromer Street residence, granted temporary custody of the children to Teresa, and gave Teresa possession of the van and the Cromer Street address. French was ordered to pay child support, expenses on the Cromer Street house, and attorney fees. The trial court also determined that the boat should be sold, and the profits divided between Teresa and French; instead, French paid Teresa $12,500 for her share of the boat and never sold it. The Cromer Street address was also to be sold, and a closing date was set for May 14, 1993.

During the course of the dissolution proceedings, French moved in with[] Oren Johnson ("O.J."), a co-worker French met through his brother. When French lived with O.J., he was very angry about the dissolution and about losing his children and his property. He often referred to Teresa as "a bitch, a whore, and a slut."

While French was staying at O.J.'s house, O.J. introduced French to his friend Woods. Woods would visit O.J., and French would speak to Woods about his pending dissolution. O.J. often overheard these conversations and heard French refer to Teresa as his "problem." French told Woods that he wanted "his problem" to be "taken care of," which meant he "wanted her eliminated from the face of this earth." Woods told French that he could "probably accommodate his needs." Woods was also having "women problems" at this time, and both men showed a negative attitude toward women. French told Woods that he did not want to lose any of his property and did not want "the divorce proceedings to go through before he took care of his problem." French had previously asked another friend if he knew of anyone who would kill his wife, and this friend stated he did not. Woods agreed to kill Teresa and to help French out with "his situation" by making sure "she was taken off the face of the earth." French told Woods that was what he wanted done, and "he was ready to go."

In their original plan, Woods was going to have a man named "Chad" commit the murder, and he set up a meeting between "Chad" and French at Woods's house. The price for the murder was agreed to be $5,000. Woods had French provide a description of Teresa, and French also supplied a picture of Teresa. The two discussed how to gain access to the Cromer residence; the plan was to pose as a real estate inspector who needed to inspect the garage for the pending sale of the home. French told Woods the murder should occur in the garage because he did not want blood splattered in the house. He also told Woods when the children would not be at home. Woods brought a .22 caliber semi-automatic handgun with a homemade silencer over to O.J.'s house and showed it to French. Woods had made the silencer himself with automotive parts and had also attached a green canvas bag to the weapon that would catch the casings when they were ejected. Woods and French fired the gun several times on O.J.'s property.

Woods and French discussed the murder of Teresa about half a dozen times in the weeks prior to the murder. French expressed a sense of urgency throughout this time and wanted it done before the dissolution was final and before the sale of the house on Cromer Street. The man named "Chad" was not doing the job according to the original plan, so Woods decided to commit the murder himself. O.J. loaned $2,500 to French, and French gave the money to Woods as half payment for the murder.

On May 13, 1993, Woods told French to be at work and to be seen by as many people as possible, which French did. On that date, Woods took the .22 caliber handgun and silencer from a toolbox at work, told his boss he was going to test drive a car, left, changed into a suit, went to Teresa's home on Cromer Street, and knocked. At approximately 10:25 a.m. on October 13, 1993, Teresa was talking on the telephone to her friend Ginger Engle ("Ginger"). She told Ginger that there was a man in a suit at the door and that she would call Ginger back later. Through the phone, Ginger could hear the man say "inspector," followed by a few more words. Woods shot Teresa at close range multiple times inside the garage, killing her. Teresa was shot twice in the head and three times in the chest, as well as in the right leg and right hand with .22 caliber bullets. No shell casings were found at the scene. After Woods killed Teresa, he changed his clothes, returned to work, and called O.J. to tell him "it was done." Woods called O.J. within a week of the murder to make sure that French knew Woods wanted the rest of his money. Woods repeatedly called O.J. after the murder regarding his money until O.J. told Woods to stop talking to him about the murder.

Teresa's murder case remained unsolved until 2008. O.J. was arrested in November 2007 for crimes unrelated to the murder, and at that time, he came forward with information about Teresa's death. O.J. gave a statement to the police and entered into a use immunity agreement with the prosecutor's office. The agreement required O.J.'s cooperation and honesty and stated that anything he said could not be used against him in prosecution for conspiracy to commit murder; however, it made no promises regarding his pending charges and did not promise immunity for any evidence of his commission of violent acts. Pursuant to the agreement, O.J. participated in interviews with the police and agreed to wear a recording device during two meetings with French. These meetings occurred on March 11 and 12, 2008.

In the time since the murder, Woods had moved to California and was apprehended by police there. Woods denied killing Teresa and knowing French. The State charged both Woods and French with murder and conspiracy to commit murder, and the two were tried separately.

At Woods's jury trial, his ex-wife Vicki Armstrong ("Vicki"), to whom he was married at the time of the murder, testified that Woods owned guns and made his own silencers. She testified that she saw Woods and French together before the murder and overheard French complain to Woods about losing his property and children to Teresa. She also stated that French told Woods that he would see Teresa dead first. Woods told Vicki about Teresa's murder at some point after it occurred and told her that someone had used an excuse to enter the house, took Teresa to the garage, that Teresa had begged for her life, and that the person made sure she was dead by shooting her in the head. Vicki also testified that Woods had a dispute with French about French owing him

3

money.

Another of Woods's ex-wives, Mary Dabbs ("Mary"), to whom he was married from 1996 to 1997, testified at the trial. She testified that he owned a lot of guns and several silencers, which he made himself. In the summer of 1997, Mary went to O.J.'s house with Woods. She overheard a conversation between O.J. and Woods, where Woods asked O.J. what he had told the police about Teresa's murder. O.J. also asked Woods about "Chad." As a result of this conversation, Woods became very upset and anxious, and Mary asked him what the conversation was about, but Woods told her to "shut up and leave him alone." On the way home, she insisted on knowing what Woods and O.J. had been talking about, and finally, Woods told her that it was about how "he had to kill Teresa French." Woods told Mary everything, including that: French went to O.J. to get Teresa murdered because they were going through a divorce and Teresa was about to get everything; O.J. introduced Woods to French; the original plan was to have a man named "Chad" kill Teresa; the murder would cost $5,000; Woods told French to go to work and be seen by several people the day of the murder; Woods used a gun with a silencer; Woods left work, changed into a suit, and went to Teresa's house; French wanted the murder to take place in the garage because he "didn't want a mess"; Teresa was on the telephone when he knocked on the door; Teresa told the caller that someone from the real estate company was there; and Woods shot her at close range. Woods also told Mary that French thought that "Chad" had shot Teresa and that she was the only one who actually knew that Woods was the killer. He threatened her and told her he would kill her if she told anyone.

*Woods v. State*, 2010 WL 4472176, *1-3 (Ind. Ct. App. 2010) ("*Woods I*") (citations omitted) (in the record at Dkt. 13-5).

A jury found Woods guilty of murder and conspiracy to commit murder, and he was sentenced to 100 years in the Department of Correction. (Dkt. 13-1 at 24-25). The Indiana Court of Appeals affirmed his convictions and sentence, and the Indiana Supreme Court denied his petition for transfer. (Dkt. 13-15; Dkt. 13-2 at 8).

On January 23, 2012, Woods filed a petition for post-conviction relief, which he later amended, and the post-conviction court denied the petition after a hearing. (Dkt. 13-8 at 1-5). On appeal, Woods alleged four grounds for ineffective assistance of counsel: (1) counsel did not present the results of a gunshot residue test; (2) counsel did not offer into evidence an address book with a label reading "Hit Man"; (3) counsel did not pursue a DNA test on a strand of blonde hair found in the victim's hand; and (4) counsel did not accommodate Woods's hearing impairment during the trial. (Dkt. 13-11). The Court

4

of Appeals of Indiana affirmed the denial of post-conviction relief. (Dkt. 13-14).

Woods sought transfer in the Indiana Supreme Court raising the same claims, which the court denied on May 5, 2022. (Dkt. 13-8 at 8; Dkt. 13-15). Woods then filed the instant petition for writ of habeas corpus, raising the same four instances of alleged ineffectiveness of trial counsel he exhausted in state court.

## II. APPLICABLE LAW

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") directs how the Court must consider petitions for habeas relief under § 2254. "In considering habeas corpus petitions challenging state court convictions, [the Court's] review is governed (and greatly limited) by AEDPA." *Dassey v. Dittmann*, 877 F.3d 297, 301 (7th Cir. 2017) (en banc) (citation and quotation marks omitted). "The standards in 28 U.S.C. § 2254(d) were designed to prevent federal habeas retrials and to ensure that state-court convictions are given effect to the extent possible under law." *Id.* (citation and quotation marks omitted).

A federal habeas court cannot grant relief unless the state court's adjudication of a federal claim on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"The decision federal courts look to is the last reasoned state-court decision to decide the merits of the case, even if the state's supreme court then denied discretionary review." *Dassey*, 877 F.3d at 302. "Deciding whether a state court's decision 'involved' an unreasonable application of federal law

5

or 'was based on' an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims, and to give appropriate deference to that decision[.]" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018) (citation and quotation marks omitted). "This is a straightforward inquiry when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion." *Id.* "In that case, a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.*

"For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102. "The issue is not whether federal judges agree with the state court decision or even whether the state court decision was correct. The issue is whether the decision was unreasonably wrong under an objective standard." *Dassey*, 877 F.3d at 302. "Put another way, [the Court] ask[s] whether the state court decision 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103). "The bounds of a reasonable application depend on the nature of the relevant rule. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Schmidt v. Foster*, 911 F.3d 469, 477 (7th Cir. 2018) (en banc) (citation and quotation marks omitted).

### III. DISCUSSION

Woods alleges four grounds for ineffective assistance of counsel: (1) counsel did not present results of a gunshot residue test; (2) counsel did not offer as evidence an address book with a label reading "Hit Man"; (3) counsel did not pursue a DNA test on a strand of blonde hair found in the

6

victim's hand; and (4) did not accommodate Woods's hearing impairment during trial. (Dkt. 1).

A criminal defendant has a right under the Sixth Amendment to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish that "counsel's assistance was so defective as to require reversal," a petitioner must show: (1) counsel's performance was deficient; and (2) counsel's deficient performance prejudiced the petitioner. *Id.* "This inquiry into a lawyer's performance and its effects turns on the facts of the particular case, which must be viewed as of the time of counsel's conduct." *Laux v. Zatecky*, 890 F.3d 666, 673–74 (7th Cir. 2018) (citation and quotation marks omitted). "As for the performance prong, because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight, *Strickland* directs courts to adopt a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 674 (citation and quotation marks omitted). "The prejudice prong requires the defendant or petitioner to 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694).

The Indiana Court of Appeals correctly stated this standard. *Woods v. State*, 2022 WL 678557, *3 (Ind. Ct. App. March 8, 2022) ("*Woods II*") (in the record at Dkt. 13-14). Thus, the Court reviews whether the appellate court reasonably applied this standard to each of Woods's alleged instances of counsel's deficient performance.

**A. Failing to secure Woods's hearing aids.**

Woods argues that his trial counsel was ineffective when he failed to ensure that the trial court accommodated his hearing impairment. The state court credited trial counsel's testimony at the post-conviction hearing that Woods never told him he had a hearing impairment, and that Woods communicated with counsel without assistance and appeared to hear trial testimony because he was able to comment on it. *Woods II,* 2022 WL 678557 at *6; PCR Tr., Dkt. 14-5 at 13. However, Woods

7

points out that trial counsel directly asked Woods if he had a "hearing problem" during a pretrial hearing and Woods responded, "yes." Trial Tr. Vol. I at 26.

Assuming that trial counsel was aware that Woods had hearing issues, and potentially received hearing aids from Woods's sister without giving them to Woods, the Court cannot conclude from these facts alone that counsel was ineffective. There is no other evidence in the record of the existence or severity of Woods's hearing deficit or that it interfered with his ability to participate in his trial. *See Burt v. Titlow*, 571 U.S. 12, 18 (2013) ("The prisoner bears the burden of rebutting the state court's factual findings by 'clear and convincing evidence.'") (citing § 2254(e)(1)). It is clear from the transcript of the pretrial proceeding when Woods indicated he had hearing problems that he could hear well enough to answer questions from both parties and to stop answering questions when instructed to do so by his counsel. *Id*. at 26-36.

The state court reasonably applied *Strickland* when it held that trial counsel was not ineffective for failing to accommodate Woods's hearing impairment. He is not entitled to habeas relief on this issue.

**B. Failing to have DNA tests performed on a hair.**

Next, Woods argues that his counsel was ineffective when he failed to seek DNA testing of a hair found on the victim's hand. The Indiana Court of Appeals' decision that counsel was not ineffective in this regard rested on the fact that trial counsel made a strategic choice not to test the hair, and on the fact that Woods declined the opportunity to test the hair during state post-conviction proceedings. *Woods II*, 2022 WL 678557 at *5-6.

At trial, the State stipulated at trial that the blonde hair found in the victim's hand did not belong to Woods, who has dark hair. PCR Tr., (Dkt. 14-5 at 38); Trial Tr. at 2319. Trial counsel testified that it was a strategic decision not to have the hair tested. He was concerned that an unfavorable result could hurt the defense. PCR Tr., (Dkt. 14-5 at 32-33). At least two of the three possible alternative

suspects proposed by the defense—Oren Johnson and Tamara Kennedy—had blonde hair. *Id*. at 33, 39. In counsel's view, it was better to leave the possibility that the blonde hair belonged to either Johnson or Ms. Kennedy, than to risk testing it and discovering that it was not a match for either one of them.

Trial counsel argued during closing that victim must have pulled the blonde hair of her assailant when she was shot. Trial Tr. at 2228-33. He further argued that the defense's alternative suspects had blonde hair and that the state failed to test the hair to learn whether it belonged to either of them. *Id*. at 2228-33; 2248-52. This argument furthered Woods's trial strategy of establishing reasonable doubt.

*Strickland* emphasizes that counsel's strategic decisions are "virtually unchallengeable" when they are based on a reasonable investigation. *Strickland*, 466 U.S. at 691. A reasonable investigation includes consideration of the risk that "pursuing certain leads may prove more harmful than helpful." *Id*. at 680-81. Although the strategic decision taken by Woods's trial counsel limited his investigation, the decision was based on sound trial strategy. Woods has failed to show that the state court's decision in this regard was an unreasonable application of clearly established law. He is not entitled to relief.

C. **Failing to admit an address book.**

Woods argues that trial counsel was ineffective when failed to offer into evidence an address book with "Hitman" on the cover that was found at the scene of the crime. The Indiana Court of Appeals found:

> Woods' counsel testified at the post-conviction hearing that, prior to trial, he spoke with Hinds, who had explained that he was a boxer and that he had adopted the "ring name" "Hitman" because he admired a boxer from Detroit with that nickname. Given that the "Hitman" label on the address book had no apparent relevance to the murder, and given that Woods does not direct us to any evidence that Hinds may have been involved in Teresa's murder, we agree with the post-conviction court that Woods has not shown that his counsel was ineffective when he did not introduce this evidence at trial.

*Woods II*, 2022 WL 678557 at *5 (citations omitted).

At first glance, a hitman's address book found at the scene of a murder for hire seems like

9

highly relevant evidence. But there is no evidence in the trial record that such a book was found at the scene of the crime. PCR Findings of Fact and Conclusions of Law, (Dkt. 13-9 at 11). It was not included in any of the pictures of the crime scene and is not listed on the State's "Digest of Evidence" or property receipts. Trial Ex. 15, 16, 17, 18; Trial Def. Ex. I, J, K, LL, MM, NN, OO, PP. During the post-conviction hearing, trial counsel testified that an address book with "hitman" on the cover was found, but he could not recall with certainty that it was recovered from the crime scene. PCR Tr. (Dkt. 14-5 at 12).

At the post-conviction hearing, trial counsel testified that he was aware of the address book and that it belonged to Jeff Hinds. Jeff Hinds was a private investigator who previously worked for the attorney representing Woods's co-defendant Tony French when French was first suspected of being involved in the murder of his wife shortly after her death. *Id*. at 11-13; Trial Tr. at 1937-45, 1958. If that weren't strange enough, Hinds testified at Woods's trial, while he was serving a sentence for a bribery conviction. Trial Tr. at 1935-36. His testimony related to his trip to the police station with French to retrieve the evidence when it was released. *Id*. at 1944-45. He suggested that French burn the evidence or otherwise dispose of it, but French ultimately decided to return it to the police. *Id*. at 1949-51.

Hinds also testified that he had known Oren Johnson since 1993 and helped him retain an attorney in 2007. Trial Tr. 1962-67, 1994. Hinds began working as a private investigator for Johnson and his attorney. *Id.* at 1967. In that role, he took Johnson to meet with a detective in Muncie to discuss an immunity agreement. *Id*. at 1968-79. He eventually worked with Johnson and police to record a conversation between Johnson and French. *Id*. at 1980-87. At some point during the investigation, Hinds was arrested and charged with bribery. *Id*. at 1936, 2006.

Hinds' role in this case is difficult to construe. He first worked as a private investigator for French's attorney, working closely with French during the investigation into the death of French's wife.

10

Later, he worked as a private investigator for Johnson's attorney and assisted in collecting evidence that would incriminate French. His relationships with both French and Johnson date back to 1993, the year French's wife was murdered. *Id.* at 1994, 2003.

Woods's trial counsel testified that he asked Hinds about the address book and learned that Hinds was a boxer, and his boxing nickname was "Hitman." PCR Tr. 12-13. Trial counsel concluded that, absent any other evidence implicating Hinds, the address book would not assist Woods's defense which was focused on suggesting that three other people perpetrated the murder—Troy Bell, Oren Johnson, and Tamara Kennedy. PCR Tr., (Dkt. 14-5 at 26).

Because Woods lacked evidence linking Hinds to the murder, the Indiana Court of Appeals found that trial counsel was not ineffective. *Woods II*, 2022 WL 678557 at *5. *See Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011) (noting that a federal court's review "focuses on what a state court knew and did."). Although this issue is not as clear-cut as Woods's other claims for relief, the state court's decision is not unreasonably wrong. *Dassey*, 877 F.3d at 302 ("The issue is not whether federal judges agree with the state court decision or even whether the state court decision was correct. The issue is whether the decision was unreasonably wrong under an objective standard."). Without evidence that the address book was found at the scene, Woods's counsel lacked other evidence with which to build a theory around Hinds as an alternate suspect. The state court reasonably applied *Strickland* and found trial counsel was not ineffective in not offering the address book.

**D. Failing to proffer positive gun residue test results on third person.**

Finally, Woods contends that his trial counsel was ineffective when he failed to offer evidence that French's left hand tested positive for gunshot residue shortly after the murder. The Indiana Court of Appeals held that the decision was reasonable trial strategy. *Woods II*, 2022 WL 678557 at *4-5. Evidence that French was the shooter was inconsistent with the defense strategy of pointing to three other possible perpetrators (Bell, Johnson, and Kennedy). PCR Tr., (Dkt. 14-5 at

11

31). Because the state's theory was that French had hired Woods to kill his wife, it was reasonable strategy to avoid any evidence relating to French. *Id*. at 11 (trial counsel testifying, "[T]he State of Indiana would have had a field day cross examining Tony French and that wouldn't have boded well for David, I don't think.").

In addition, trial counsel's ballistics expert advised that gunshot residue testing was likely to be discredited at trial as unreliable, and the death of the detective who had preformed the test created foundational issues for presenting the test results at trial.[1] *Id*. at 30-31. The state court reasonably found that trial counsel's decision not to offer the gunshot residue test results was a reasonable strategic decision and not deficient performance. *Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."). Woods is not entitled to relief on this claim.

## IV.   CERTIFICATE OF APPEALABILITY

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal." *Buck v. Davis*, 580 U.S. 100, 115 (2017). Instead, a state prisoner must first obtain a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In deciding whether a certificate of appealability should issue, "the only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck*, 580 U.S. at 115 (citation and quotation marks omitted).

Rule 11(a) of the Rules Governing Section 2254 Proceedings in the United States District Courts requires the district court to "issue or deny a certificate of appealability when it enters a final

---

[1] The stipulated testimony from other deceased witnesses was offered at trial. Trial Joint Exs. 1, 2, 3, 5, 6.

12

order adverse to the applicant." No reasonable jurist would disagree that Woods's claims are meritless. Therefore, a certificate of appealability is **denied**.

### V.   CONCLUSION

Woods's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **denied**, and a certificate of appealability is **denied**. Final Judgment in accordance with this decision shall issue.

**IT IS SO ORDERED.**

Date: 2/9/2026

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

All Electronically Registered Counsel